# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
December 4, 2012 Session

## STATE OF TENNESSEE v. MICHAEL LOVE

**Appeal from the Criminal Court for Shelby County**
**No. 09-00014    Carolyn Wade Blackett, Judge**

---

**No. W2012-00404-CCA-MR3-CD  - Filed March 13, 2013**

---

A Shelby County jury convicted the Defendant, Michael Love, of aggravated rape, aggravated robbery, aggravated burglary, and employing a firearm with intent to commit a felony. The trial court sentenced the Defendant to an effective sentence of twenty-four[1] years in the Tennessee Department of Correction. On appeal, the Defendant contends that: (1) the trial court erred when it failed to suppress a photographic lineup of the Defendant, which he asserts was unnecessarily suggestive; and (2) the trial court erred when it enhanced the Defendant's sentence. After a thorough review of the record and applicable authorities, we affirm the Defendant's convictions and sentence. Having noticed, however, that there are clerical errors in the judgments of conviction for the aggravated rape, aggravated robbery, and employing a firearm with intent to commit a felony convictions, we remand this case to the trial court for entry of corrected judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

Michael R. Working, Memphis, Tennessee, for the appellant, Michael Love.

---

[1]The judgements of conviction contain clerical errors, but it is clear from the record that the trial court intended to sentence the Defendant to an effective sentence of twenty-four years.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Greg Gilbert and Susanna Shea, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION
## I. Facts

This case arises from a rape and robbery that occurred on March 7, 2008. In connection with this rape and robbery, a Shelby County grand jury indicted the Defendant on charges of aggravated rape, aggravated robbery, aggravated burglary, and employing a firearm during the commission of a felony. At the Defendant's trial on these charges, the parties presented the following evidence:[2]

The victim, a thirty-year-old female "health care professional," was at her home located in the Winchester Town Home Village complex on March 7, 2008, with her two children, who were one year old and tens year old. There were two floors to the home, with one bedroom and the kitchen downstairs and two bedrooms upstairs. The victim's son slept in one of the bedrooms upstairs, and the victim's infant daughter slept in the other upstairs bedroom with the victim. Several people had keys to her home at the time, including her seventeen-year-old brother, Ramon, her mother, and the father of her daughter. The victim's brother attended a school close to her house and would sometimes visit after school and/or stay the night with her.

On March 7, 2008, it snowed all day in Memphis. The victim maintained her daily morning routine despite the snow. She, however, left work early at around 2:00 p.m., retrieved her children from her son's paternal grandmother's house, and returned home at around 6:30 p.m. The victim cooked dinner, played with her children, and put them to bed at around 9:30 p.m. Her son was in his bedroom, and her daughter was in the room with her before the victim fell asleep without turning off her television.

The victim awoke during the night and, by the light of her television, she saw a black man standing in the hallway, ten feet from her. She called out her brother's name, and the man did not answer. The victim said that, after she had called her brother's name multiple times, she turned on her light and put on her glasses at which time she saw the man was not her brother. The man said to her, "I'm not Ramon." The victim picked up her daughter and asked why the man was in her home. The victim described the man as "slender" and a few inches taller than her height, which she stated as five-foot eleven inches. He wore jeans

---

[2] Because the Defendant does not challenge the sufficiency of the evidence, we summarize the facts presented in the light most favorable to the State.

bearing red writing and also two or three jackets over a gray hooded sweater. The victim gave the man her cellular phone and the money she had lying on the table without him asking for either. At trial, the victim identified a cellular phone police had recovered during their investigation as the one that she had given to the man.

After the victim handed the man her cellular phone and money, the man questioned the victim, who was still holding her daughter, about whether she had a boyfriend. The victim said she did not have a boyfriend and asked if the man was talking about her brother, Ramon, and the man said, "No." The man said he could not believe "they sent him in there," and the victim asked what he meant by this comment. The man again inquired about whether she had a boyfriend and asked whether he could "get to know [her]." The victim offered the man a piece of paper and asked him to write his number on the paper, so she could call him at a later time. The victim said, at the time, she had no intention of calling the man socially but was trying to be nice to him because she feared for her life. The man offered her his phone number, which she wrote down. The man offered his name as "Low Key."

The victim said the man continued to talk with her for some time until a second man, whom the victim later identified as the Defendant, came up the steps and stood in her room. She described the Defendant as shorter than the first man, making him about her same height. She said the Defendant was "dark skinned" and wore jeans and a black hooded sweater. The Defendant looked at "Low Key" and said, "[L]et's dip." The first man asked the Defendant what was wrong, calling him "cuz," and the two men walked away. As they were walking away from her, the victim saw a box cutter in the Defendant's hands.

As soon as the men left her room, the victim used her cordless house phone to dial 911. She said an operator did not answer her call before the first man returned to her room, saying that she was "going to give it up tonight." The victim implored him not to rape her. The victim said she disconnected her call to 911 and showed the first man the telephone. The first man again told her that she was going to "give it up," and the victim responded that she had his cellular phone number and that she would call him later. The first man reached in his pocket and showed her a small silver handgun. The victim, who still had her daughter in her arms, asked the first man to at least wear a condom if he was going to "do anything to [her]." He agreed, went into the hallway, and came back in her room and showed her a condom package.

The victim repeatedly asked the first man not to "do this." The first man pulled down his pants, and the victim began pinching her daughter hoping to make her cry, thinking he would stop if she began crying. The first man again showed the victim his gun. He then raped her. The victim could tell he was wearing a condom, and she was unsure whether he ejaculated. The victim's daughter remained asleep in the victim's arms during the rape.

When the first man finished, he left the room. He returned and said "his cousin wanted some."

The victim said that the Defendant then came into her room and told the victim she was "going to give him some head." The victim told the second man, "I don't suck dick." He told her that she was going to "give [him] some," and he pushed her down. The victim said she again pinched her daughter, who began to cry. The Defendant pulled his pants down, got on top of the victim, and started to rape her. Her daughter, who was crying, lay between her and the Defendant, who was on top of her. The victim said that the Defendant's face was six inches from her own during the rape. He wore a hood, but she could see his face from the forehead down. He wore two diamond earrings.

The victim said the Defendant finished and went downstairs. She described herself as "out of [her] mind" at the time, saying that she was holding her baby and rocking. The victim then heard a voice downstairs holler, "hey," followed by a lot of commotion. The victim went downstairs, where she noticed that her son's computer was missing and her belongings were displaced. She again called police and then several family members.

The victim identified several pictures taken by police. Some of the photographs depicted how the men had gained entry into her home through the downstairs bedroom window. The men cut the screen in the window and opened the window. Another picture showed a condom wrapper on the floor of her bedroom.

The victim went to the Memphis Sexual Assault Resource Center ("MSARC") to be examined. Several of her friends and family, whose contact information was stored in her cellular phone, contacted her and said that they were receiving calls from her cellular phone. Her friends, who were mostly female, told her that the men using her cell phone were speaking in a "quite vulgar" manner and saying obscene things. On March 8, 2008, the victim called her cellular phone several times. She noted that her voice mail had been changed and that the voice mail recording was of a man's voice stating that the caller had reached "Low Key."

A week later, the victim again called her phone, and a young woman answered. The woman told her that she had received the phone from "Little Mike." The victim asked the woman who "Little Mike" was, explaining that her cellular phone had been taken from her. A man then got on the phone line, and the victim asked the man his identity, again explaining that her cellular phone had been taken from her. The man replied, "Bitch, don't be mad at me cause somebody took your pussy."

The victim testified that, during a previous criminal proceeding, she identified the first man who had come into her room as Pshawn Oliver. The victim them described the psychological impact she suffered as a result of these rapes.

The victim testified that Lieutenant[3] Gwendolyn Lawrence with the sex crimes division of the Memphis Police Department was assigned to her case and came to see her the night of the rapes. During the lieutenant's investigation, she showed the victim multiple photographic arrays of suspects. In the first photographic lineup, the lieutenant showed her an array of six suspects, and she asked the victim whether she recognized any of the individuals as either of the perpetrators. In a second photographic lineup, the victim positively identified one of the pictures as depicting the first man who raped her, whom she described as "the leader." She later learned this picture was of Pshawn Oliver. In another photographic lineup shown to her by Lieutenant Lawrence, the victim quickly identified one of the photographs as depicting the second man who raped her, the Defendant. She noted that, in the photograph, the Defendant wore a hooded sweatshirt, but she said that she was looking at the faces of the suspects and not their clothing.

During cross-examination, the victim said she viewed more than four lineups during the course of this investigation. She said that, the day after the rape, her brother, Ramon, went to the gym where he played basketball, which was next door to the victim's complex, and asked whether anyone knew a man using the nickname "Low Key." Ramon was informed that there was someone at the gym at that time who did use that name, and Ramon discovered that there were two men who were together and that they had signed in as "Mike" and "Low Key."

Officer Darnell Bridgeforth, Jr., a Memphis Police Department Officer, responded to the victim's 911 call at around 11:00 p.m. on March 7, 2008. The victim called from the Winchester Village Town Homes, which were adjacent to the Highland Pines apartment complex.[4] He noted that the two complexes were separated by a fence and that the fence had a "plethora" of holes in it at the time of this incident.

The original caller placing the 911 call to which he responded had hung up before speaking to the 911 operator. It took Officer Bridgeforth and a trainee with whom he was working, Officer Wilson, approximately ten minutes to travel to the town homes because

---

[3]The victim identified Lieutenant Gwendolyn Lawrence as "sergeant." Lieutenant Lawrence testified at trial and explained that at the time of this investigation she was a sergeant but that she was later promoted to lieutenant. Throughout this opinion, we will refer to her as "Lieutenant."

[4]The testimony of the proximity of the two complexes becomes relevant based upon other evidence later presented by the State.

roads were icy from inclement weather. Once the two officers arrived, they were forced to park some distance from the home and walk from their car to the home.

The officers finally arrived at the victim's home where they noticed that the sliding door was slightly ajar, so Officer Bridgeforth slid the door all the way open. He then pulled back the vertical blinds covering the door and saw two black men standing at the foot of the stairs. Officer Bridgeforth yelled at the men, indicating that they were police officers, and the two men ran out the front door of the home. The officers began to chase the men, but, by the time the officers reached the front of the house, the men were gone. Other officers arrived at the scene and drove around looking for the men. Officer Bridgeforth and Officer Wilson went inside the home to check to see if there was anyone who was injured inside.

Upstairs in the home, the officers found the victim in her bedroom. The officers spoke with the victim, who told them what had happened. They also spoke with the 911 operator, who had been on the line during a portion of this incident and who had heard the victim say, "[N]o please don't rape me." The two responding officers notified their lieutenant, who sent officers from the Sex Crimes Bureau and also crime scene investigators. Officer Bridgeforth investigated the area of the home where the two men gained entry, noting that a glass panel of one of the victim's windows had been broken, and the window was open. Officer Bridgeforth also investigated the footprints left in the snow by the men running away from the victim's home. The footprints led to a M&M Express, but, in the parking lot of that establishment, the footprints indicated the men separated, and officers could not distinguish where the footprints led after the parking lot. Officer Bridgeforth returned to the victim's home and transported her to MSARC to be examined by nurses.

Officer Bridgeforth described the two men as shorter than 5'7" and said they were "significantly younger" than his almost forty years of age. Both men were wearing heavy jackets, and the officer did not get a good look at their faces.

Officer Michael Lewis Hill, a crime scene officer with the Memphis Police Department, responded to a call with regard to this case. He took multiple photographs of the scene and he gathered evidence, including pieces of two condom wrappers from the upstairs landing of the stairwell. The officer also gathered the victim's purse, which was on her bed, and bedding from her bed for further testing. The officer collected a Play Station box, and a computer, which he submitted to be tested for fingerprints. The officer also took pictures of a suitcase that was resting on top of a sofa in the livingroom. Officer Hill noted that the intruders entered through a downstairs window, the screen of which had been cut. Officer Hill testified he was unable to obtain any ridge detail from the point of the intruders' entry and that he did not test the front door for fingerprints. He also saw no ridge detail on the condom wrappers or the computer and no DNA evidence on the bedding.

Lieutenant Gwendolyn Lawrence, with the Memphis Police Department, testified that she was assigned to the Sex Crimes Division at the time of these crimes, and she handled the victim's case. Lieutenant Lawrence said that, when she arrived at the victim's house on the night of this incident, another officer from her division, Lieutenant Cleveland, was already present. The lieutenant said that she was the only female officer at the scene, so she took charge of speaking with the victim, and Lieutenant Cleveland oversaw the evidence collection. While speaking with the victim, Lieutenant Lawrence learned that the victim did not know her assailants.

Following normal procedure, the victim was transported to MSARC for the collection of evidence and to receive medical attention. The lieutenant said that the nurses there were unable to gather any DNA evidence during the examination.

Lietuenant Lawrence testified that they generated suspects in this case based in part upon one of the intruders identifying himself as "Low Key." The victim told the lieutenant that the intruders were young, so the lieutenant asked school officers whether they were aware of anyone using that nickname. She was later informed that a young man named Keithland Boyce was referred to by that nickname. She showed the victim a photographic lineup that contained Boyce's picture, along with the pictures of five other similar looking men. The victim did not positively identify any of the men in this lineup.

Lieutenant Lawrence said that the victim called her and told her that she had called the cellular phone that had been stolen from her during the home invasion. The victim said that a woman by the name of Pshawndra Oliver answered the phone. The lieutenant then called the phone and spoke with Ms. Oliver, who told her that she had gotten the phone from her brother, Pshawn Oliver, and his friend "Little Mike." The lieutenant then developed the names Pshawn Oliver, the Defendant, and Stefon Bobo as suspects. She created three photographic lineups of Pshawn Oliver and Stefon Bobo. The victim identified Pshawn Oliver from the lineup as one of the men who raped her, and she mentioned his "big ugly eyes." The victim did not identify anyone from the lineup that included Bobo's picture. Five days later, the lieutenant showed the victim a photographic lineup that included the Defendant's picture, and the victim identified the Defendant as one of the men who had raped her.

Pshawndra Oliver ("Ms. Oliver") testified she was the sister of Pshawn Oliver and that she knew the Defendant because they lived in the same neighborhood and because the Defendant was friends with her brother. Ms. Oliver testified that, around the time of these events, Pshawn Oliver lived with her and their grandmother at the Highland Pines Apartments. Ms. Oliver identified a Motorola Razor phone that her brother purchased for her from the Defendant in March 2008. The owner of the phone called her multiple times,

and later that same week, a detective called her to ask if she had the phone in her possession. Ms. Oliver told the detective that she had the phone, and the detective came and confiscated the phone from her. Ms. Oliver identified a photograph of the Defendant that depicted him holding a "grey" gun and wearing an earring.

During cross-examination, Ms. Oliver said she initially lied to police officers and told them that she had bought the phone. She also said Pshawn Oliver told her that he knew the victim because he had babysat for the victim's children.

Christine Elaine Gable, a family nurse practitioner, testified that she worked at MSARC and examined the victim after the rapes. She conducted a physical exam of the victim, who was "trembling [and] tearful," and also collected swabs from different areas of her body. Nurse Gable testified that the victim's genitalia displayed signs of "[b]lunt penetrating trauma" consistent with force into that area of tissue and also consistent with sexual assault. The nurse was unable, however, to find the presence of any sperm.

As part of its case in chief, the State presented evidence about another home invasion that occurred on the same night as the home invasion during which the victim was raped. Cassius Ray Bafford testified that, on March 7, 2008,[5] he was living in the Highland Pines apartment complex, which was located on a property connected to, but separated by a fence from, the property upon which the Winchester Village Town Homes were located. On March 7, it was snowing, and snow had accumulated on the ground and streets. At around 6:00 or 7:00 p.m., Bafford heard a noise that sounded as if someone had broken one of the back windows to his townhome. He went to the front door and heard a noise, a "bang alang lang." He assumed someone was coming into the back of the apartment and, because he did not have a gun, he left out of the front door. Bafford contacted police, who later arrived and examined the broken window and the items taken from Bafford's home.

Bafford, who knew the Defendant because the two had worked together at a fast food restaurant, saw the Defendant on the same night of the burglary, shortly after his home had been burglarized. The Defendant lived in the same apartment complex as Bafford. When Bafford saw the Defendant, he warned him that someone had broken into his apartment. The Defendant, at the time, was accompanied by another man whom Bafford had never seen but later learned was Mr. Oliver. A few days after the burglary, Bafford saw Mr. Oliver wearing a pair of his pants that had been taken during the burglary.

---

[5]We note that, in the record, Bafford testified about "May 7, 2008." All other indications from the record were that this incident occurred on "March 7, 2008," a date upon which it snowed heavily.

Officer Eric R. Johnson responded to Bafford's call to police and arrived at around 8:30 p.m. The officers noticed that some of Bafford's things had been "moved around," but the officers did not see any obvious fingerprints.

The Defendant presented several witnesses at trial. Tracy Love, the Defendant's mother, testified that the then seventeen-year-old Defendant was living with her on March 7, 2008. She said she spoke with Lieutenant Lawrence and gave the lieutenant permission to speak with the Defendant about a missing cellular phone. The lieutenant spoke with the Defendant for about fifteen minutes and then asked Love if she could take the Defendant to the police station for further questioning. Love acquiesced, thinking at the time that the Defendant was not under arrest. The Defendant returned home a few hours later. Five days later, on April 2, 2008, Love received a phone message saying that the Defendant had been arrested for rape.

During cross-examination, Love denied that she knew that the police were investigating the Defendant's potential involvement in a crime. Love said she did not go to the police station with the Defendant because she felt confident he could handle his own affairs.

Dr. James Walker, a forensic neuropsychologist, testified as an expert witness about eyewitness identification of a suspect perpetrating a violent crime. He said that the research is clear that people involved in a violent crime tend to focus on the weapon possessed by the perpetrator rather than the perpetrator's face. He further said that anything drawing a victim's attention away from the assailant, including a child, would render the victim less likely to accurately remember the assailant. The higher a witness's stress during the crime the worse his or her recollection of the event.

Dr. Walker also testified about lineups, saying that many things can affect the witness's ability to accurately identify the perpetrator of a crime. One of those might be a well-intentioned officer who knows the likely suspect. The officer might give non-verbal cues, such as smiling or head nodding, that might lead a witness into an identification. The doctor said that witnesses misidentifying the perpetrator of a crime is the single most powerful factor in innocent people being convicted.

Dr. Walker said he reviewed the lineups shown to the victim. He said that the "Low Key" lineup contained "poor fulls," meaning photographs of men other than "Low Key" that did not look similarly enough to him. He described the photographic lineup containing Mr. Oliver's picture as "much better" but said that it still had "some issues." Dr. Walker then said that the lineup containing the Defendant's picture was "poorly formulated" because it contained three men who had "distinctive hairstyles," one man with "very distinctive

clothing," and men who had different color skin tone. He said there were "serious problems" with the photographic lineup.

Mr. Oliver testified that he knew the Defendant from seeing him around their apartment complex. Mr. Oliver said he had been charged with raping the victim and that he pled guilty to that offense. He said that he was at the victim's house with another man named "Player Jay" and that he was not with the Defendant that night. Oliver said that he took the picture of the Defendant that depicted the Defendant holding a gun. He said the picture was taken in a vacant apartment. Oliver said the coloring in the photograph was "off" and that the Defendant was holding a black gun and not a grey gun. Oliver was sure the gun depicted in the photograph was black because it was the same gun that was used during the rape of the victim.

During cross-examination, Oliver testified that he took the picture of the Defendant while the two were in a vacant apartment in their apartment complex smoking marijuana. He said that he had used his own equipment to print the picture. Oliver said the picture showed the Defendant holding the gun that Oliver had used during the rape. The gun, he said, was black.

Mr. Oliver denied knowing the Defendant well and said they were not good friends, but he had "seen him around sometimes." Oliver admitted raping the victim, and he said he wore a condom during the rape. Oliver also admitted to burglarizing Bafford's apartment on the same night as the rape. He said he perpetrated the rape before he burglarized Bafford's apartment. He agreed that, after the burglary, he and the Defendant saw Bafford at the apartment complex. Oliver said he did not indicate to Bafford that it was he who had burglarized Bafford's home. Oliver testified that, while the Defendant was with him when the two men saw Bafford, the Defendant was not with him when he burglarized Bafford's home.

Oliver agreed that he had received letters from the Defendant's family while he was in jail. The letters offered Oliver compensation if he would "take the charge" for the Defendant.

Oliver said that he never purchased or received a phone from the Defendant. He said that his sister was mistaken and must have been speaking of a different "Mike." Oliver said he took the phone during the home invasion and rape.

Based upon this evidence, the jury convicted the Defendant of aggravated rape, aggravated robbery, aggravated burglary, and employing a firearm with intent to commit a felony. The trial court sentenced the Defendant to twenty years for the aggravated rape

conviction, ten years for the aggravated robbery conviction, five years for the aggravated burglary conviction, and six years[6] for the employment of a firearm during the commission of a felony conviction. The trial court ordered the sentences for the aggravated rape, aggravated robbery, and aggravated burglary convictions to run concurrently with each other but consecutively to the Defendant's sentence for his employment of a firearm during the commission of a felony conviction, for a total effective sentence of twenty-four years. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it failed to suppress a photographic lineup of the Defendant, which he asserts was "impermissibly suggestive;" and (2) the trial court erred when it enhanced the Defendant's sentence.

### A. Motion to Suppress

The Defendant contends that the trial court erred when it failed to suppress evidence that the victim identified him in a photographic lineup as a perpetrator of these crimes. In support of his contention, he offers a quote from the Fox and Friends Morning Show during which the hosts were discussing the case of Trayvon Martin, a young teenager in Florida who was fatally shot allegedly based upon a misunderstanding of his intentions. During the show, the hosts discussed that a person in a hooded sweatshirt, referred to as a "hoodie," is more likely to be perceived as having criminal intentions. The Defendant then notes that he was the only one in the photographic lineup wearing a hooded sweatshirt, the same clothing as the attacker, which made the lineup impermissibly suggestive, violating his constitutional rights. The State counters that the identification procedure was not unduly suggestive and that, under the totality of the circumstances, the identification was reliable.

Before trial, the Defendant filed a motion to suppress the photographic lineup. At a hearing on that motion, the parties presented the following evidence: The victim testified that Lieutenant Lawrence showed her four[7] different photographic lineups in relation to this case. The first of those four, which she viewed on March 19, 2008, more than ten days after this

---

[6] As will be discussed below, it is unclear from the record whether the Defendant was sentenced to four or six years for this offense. The sentencing transcript indicates the trial judge intended to sentence him to four years for this offense. The judgment of conviction, however, appears to reflect a six year sentence. As stated below, we are remanding this case for entry of legible and consistent judgments and sentencing documents.

[7] In later testimony, the victim said that she may have been shown five lineups, but it appears from the totality of the record that she was likely only shown four.

incident, contained a picture of a man who went by the nickname "Low Key." The victim said she did not identify any of the photographs as being of either of the men who raped her.

The victim viewed a second lineup on March 22, 2008. The lieutenant showed her an instruction sheet for photographic lineups. The sheet stated that the victim needed to understand that the lineup was an important procedure designed to clear the innocent as well as to ensure accurate and reliable identification of the guilty. The procedure listed for identification on the sheet was as follows:

> 1. The photographic display will contain pictures of persons of similar descriptions and similar poses.
>
> 2. There is no significance to the order in which the photos will appear.
>
> 3. The person's picture may or may not have anything to do with the suspect offense and [the victim] is not to assume that the guilty party must be . . . one[] of the persons represented.
>
> 4 During the interview process no one is to give [the victim] any hints or suggestions or attempts to influence [her] identification in any way.
>
> 5. If [the victim] make[s] any identification it will be done in writing.
>
> 6. [The victim is] to make no identification unless [she was] positive of such identification.

The victim identified the photograph of Pshawn Oliver as being of one of the men who had raped her. She identified him as "suspect 1," and she said he was "the main guy" that raped her. She said he seemed to be the leader. She had previously described this suspect to police as having "big, big bug ugly eyes," as being unattractive, and as in need of a haircut. She said she got a good look at Mr. Oliver because he was on top of her, face to face, during the rape. The victim also identified Oliver in court as one of the men who had raped her.

On that same day, the lieutenant showed the victim a third photographic lineup. The victim did not identify any of the photographs in the third lineup as being of the second man who had raped her.

The victim said she was shown a fourth photographic lineup on March 27, 2008. Before viewing the lineup, the lieutenant again instructed her on the procedure for viewing lineups. The victim said that she identified the Defendant from the pictures contained in the

-12-

fourth photographic lineup. On the lineup sheet, the victim circled the Defendant's picture, which was in position six, and wrote, "This is the suspect number 2," meaning that it was the second man who had raped her. The victim recalled that, during the rape, the Defendant was wearing a gray, hooded jacket that covered his head and hair. She could see him from his forehead to his chin, and she saw that he was wearing two diamond earrings. The victim also identified the Defendant at the hearing as the second man who had raped her.

During cross-examination, the victim testified that she described the second man who raped her as "dark skinned." She said his hood was covering his hair, so she could not see his hairstyle. She said that, in the pictures shown to her alongside the Defendant's picture in the fourth lineup she was shown, only three of the men had what she would call "dark skin." The Defendant was the only man in any of the pictures that was wearing a grey, hooded sweatshirt.

Lieutenant Lawrence testified that she showed the victim four photographic lineups with potential suspects in this case. She said that, when she created lineups, she attempted to put together pictures that generally fit the same description in some ways. Before showing a witness a photographic lineup, she would read and show them a document that contained instructions to witnesses viewing a lineup.

The victim did not identify any of the pictures in the photographic lineup containing a picture of a man going by the nickname "Low Key." In the second photo lineup, the victim identified Pshawn Oliver as being one of the men who raped her. The lieutenant said the victim picked his picture as "[s]oon as she looked at it." The victim did not pick out any picture from the third photographic lineup.

The lieutenant said that the victim had described the second man who raped her as:

dark complected male, short, five-two to five-six, a hundred and eighty pounds. Possibly nineteen to twenty-two years old. Diamond earrings in both ears. He was wearing jeans, a gray hoodie over his head and referred to as Player J by suspect 1.

The fourth photographic lineup, containing the Defendant's picture, was generated by the juvenile court. The lieutenant again reminded the victim about the appropriate considerations to make when viewing a photographic lineup. The victim viewed the lineup, and circled the Defendant's picture. She wrote on the lineup that he was the second suspect.

During cross-examination, the lieutenant testified that when she created the photographic lineups, she attempted to have the suspects all have similar hair but not

necessarily similar clothing. She clarified that she also would not want the suspect to be dressed differently so that he was an obvious choice. The lieutenant testified that in the photographic lineup containing the Defendant's picture, he was wearing a white t-shirt and a gray sweatshirt.

Based upon this evidence, the trial court denied the Defendant's motion to suppress finding:

> The victim was shown multiple photographic lineups before she was able to positively identify . . . the Defendant[]. When she made the identification, she quickly identified . . . [the] Defendant[] without hesitation. Defendant Love's photograph was not suggestive. [The] Defendant appears the same or similar age, race and skin coloring as all of the others photographed for the array. [The] Defendants do not have any distinguishing marks on their person. Everyone in the photo array is wearing . . . similar clothing and all of the photographs are of the same size and shape. Although [Defendant] is wearing a hooded shirt in the photo, [neither] its color nor the fact that it is a hooded shirt is apparent from looking at the photo and despite defense counsel's assertion regarding the individuals' three and four hair, it is reasonable to conclude that if each wore a hood over their heads, their hair would be covered just as easily as [the] Defendant['s]. Further, the victim testified that she saw [the Defendant] face-to-face throughout her rape. Accordingly, this Court cannot conclude that the photographic arrays are unduly suggestive.

(footnote and citation omitted). The trial court went on to consider whether the photographic lineup was unduly suggestive in light of the totality of the circumstances, and it concluded that the lineup passed constitutional muster. It is from this judgment that the Defendant now appeals.

An appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998). In conducting our review, it is a settled principle that "[f]indings of fact made by the trial judge after an evidentiary hearing of a motion to suppress are afforded the weight of a jury verdict, and this court will not set aside the trial court's judgment unless the evidence contained in the record preponderates against his findings." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996) (quoting *State v. Adams*, 859 S.W.2d 359, 362 (Tenn. Crim. App. 1992)). In addition, the Tennessee Supreme Court has stated:

-14-

Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

*Id.* at 23.

Our analysis of this issue is based upon the long-standing precedent set out in the United States Supreme Court's holdings in *Simmons v. U.S.*, 390 U.S. 377 (1968) and *Neil v. Biggers*, 409 U.S. 188 (1972). *See State v. Reid*, 213 S.W.3d 792, 825 (Tenn. 2006). In *Simmons*, the Court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384. In *Neil*, the Court established a two-part analysis which the trial court must apply to determine the validity of a pretrial identification. 409 U.S. at 198-200. First, the trial court must determine whether the identification procedure was unnecessarily suggestive. *Id.* at 198. Next, if the trial court determines that the identification was unnecessarily suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. *Id.* at 199. In Tennessee, it is unnecessary to apply the totality of the circumstances test described in *Biggers* if the trial court determines that the identification procedure was not unnecessarily suggestive. *See State v. Butler*, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990) (declining to apply the totality of the circumstances test when a lineup was not found to be unnecessarily suggestive).

When a defendant argues that a lineup is suggestive based on differences between the subjects of the lineup, this Court has required that the subjects be "grossly dissimilar" before it will find that the lineup is impermissibly suggestive. *See State v. Edwards*, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (citing *U.S. v. Wade*, 388 U.S. 218 (1967); *Young v. State*, 566 S.W.2d 895 (Tenn. Crim. App. 1978); *Shye v. State*, 506 S.W.2d 169 (Tenn. Crim. App. 1973)).

Based on our review of the record, we agree with the trial court and conclude that there was nothing unnecessarily suggestive about the photo lineup. The lineup contains photographs of six African American men, all of whom appear to be of similar age, similar

complection, and similar size. Two of the men have slightly longer hair than the other four, but the victim clearly said she could not see the suspect's hair at all during the incident. In the photograph of the Defendant, he appears to be wearing a white t-shirt. Upon a closer inspection of the picture, the Defendant also appears to be wearing an unzipped, black and grey jacket, a small part of which covers his white t-shirt. It is unclear from the picture whether the jacket has a hood attached to it. All of the photographs are taken on a white background. A suspect other than the Defendant has a slightly darker background and is the only subject wearing a brightly colored shirt.[8] We conclude that there is nothing about the clothing depicted in the photographs that draws the witness's attention away from or toward any particular man in the photographs. The characteristics of the jacket worn by the Defendant in the photograph are not apparent from the photograph, and he appears to most noticeably be wearing a white t-shirt, similar to four of the men in the other photographs. The Defendant's photo is not "grossly dissimilar" to the others in the lineup, and the lineup is not impermissibly suggestive. Our inquiry need not go further, and the Defendant is not entitled to relief on this issue.

## B. Sentencing

The Defendant next contends that the trial court erred when it sentenced him. He asserts that the trial court failed to state which enhancement factors applied to which of his convictions. The Defendant asserts that the trial court improperly applied enhancement factor (5), that the Defendant treated the victim with exceptional cruelty, to his convictions. *See* T.C.A. § 40-35-114(5) (2010). He also asserts that the trial court improperly applied enhancement factor (7), that the offense involved a victim and was committed to gratify the Defendant's desire for pleasure or excitement. *See* T.C.A. § 40-35-114(7). The Defendant finally contests the trial court's application of enhancement factor (10), that the Defendant had no hesitation about committing a crime when the risk to human life was high. *See* T.C.A. § 40-35-114(10). The State counters that the evidence supports the trial court's application of these three enhancement factors and also supports the Defendant's sentence.

At the sentencing hearing, the State read into evidence a statement by the victim who discussed the negative impact of these rapes on her life. She said she feared that her attackers or their family members would find her and try to harm her for pressing charges. The victim recounted how she was still in therapy, three years after these crimes. She suffered from "emotional injury" and "extreme depression." The victim said that she lived with the fear that her identity would be stolen, as a result of the robbers taking her social security card. The victim asked for a sentence of over twenty years for the Defendant,

---

[8] The photograph of suspect #4 is of a man wearing a yellow, blue, and white patterned shirt on a darker grey background.

reminding the trial court that not only was she raped, but she was raped while she held her child in her arms.

The State then asked for the trial court to apply several enhancement factors and to sentence the Defendant to consecutive sentences for his convictions. The Defendant's counsel countered that the trial court should not apply those enhancement factors, should apply several mitigating factors, and should order concurrent sentences. The State informed the trial court that the Defendant's sentence for employing a firearm must run consecutively to his other sentences.

Based upon the evidence, the trial court sentenced the Defendant as follows:

The Court is required to look at the Presentence Report as well as all the factors of each one of these offenses. It's the understanding of the Court based upon the Presentence Report that [the Defendant] has not been in any trouble before. So, therefore, that he will qualify to the extent as the law would allow him to be qualified, as a range I Offender.

However, as to the seriousness of the crimes that he committed, starting off first with Count 1, the aggravated rape charge to which he was found guilty of, the Court does find the following enhancement factors:

(1) the defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense. And that's because of the fact that that child was there and the woman was raped while she was holding her child. And there is some conflict in testimony that was during the trial as to whether or not she was actually holding the child during the entire rape or that the child was in the room and she had laid the child down beside her.

I do remember the testimony that she pinched the child trying to get the child to cry but I wasn't real sure that the child was awake. Actually, quote, unquote, witness the entire rape or was it just that the child was in her arms and at one point she put the child down to the side while she was raped. And I think what for the jury and everybody else concerned just the fact that she was raped and her own child was in the room while that act was being done was absolutely something that most people could not even conceive or [fathom] that . . . the mother would be raped while a child even though it's a baby, was in that room.

-17-

The other enhancement factor this Court finds is that the offense involved the victim and was committed to gratify the [D]efendant's desire for pleasure, excitement and I do know that that one is a very close one because part of aggravated rape is that the act is committed to gratify one's sexual pleasure. Again, because of the facts of the case, because of the fact that the two defendants were going to leave and then they came back, I'm not really sure as to whether or not even though there was a rape that it was the intent of the [D]efendant to comply with that sexual gratification or if it was more so because of part and parcel of the robbery and everything else that was going on.

The other enhanc[ment] factor that I do find is the [D]efendant had no hesitation about committing a crime when the risk to human life was high. There was a weapon involved even though it was not particularly identified as being a gun. Based upon the facts that were given during the testimony of the trial, not only could the mother have been hurt or killed but the infant as well, and I'm also aware that there was another child in the house during the entire episode in which there was a robbery and there was a burglary.

And there was a firearm involved and so things could [have] gotten totally out of hand and somebody could [have] ended up being killed.

. . . .

Those are the enhancement factors that this Court has found . . . . As far as the mitigating factors, [Defense Counsel] makes a very good argument about the fact that this was a juvenile and that he had not been in trouble before and that's the only mitigating factor that I do find. . . .

. . . . As far as the mandatory consecutive sentencing is concerned, this Court is going to follow the law in which all Three Counts will be served concurrently and they will be consecutive to the 4th Count which is the unlawful employment of a firearm during the commission of a dangerous felony as required by law.

As to the sentencing for the aggravated rape, it is a Class A Felony and based upon the enhancement factors, based upon everything else, this case is for aggravated rape, the Court has to look at basically 15 to 25 years which is Range I Offender in terms of the aggravated rape.

And the Court is going to sentence [the Defendant] to 20 years for the aggravated rape. As to the aggravated robbery, the same enhancement factors were found as far as the First Count as well as the burglary, the same enhancement factors which were the three I enumerated before.

As to the sentencing to the aggravated robbery, it's a Class B Felony. It's eight to 12 years. In terms of sentencing on a Range I, the Court is going to sentence him to 10 years.

As to the aggravated burglary, the sentencing range is three to six years. The Court will sentence him to five years.

As to the unlawful employment of a firearm during the commission of a felony, the Court will sentence him to the max because of the circumstances . . . of the children were in the house to four years.

So the years are . . . 20 for the aggravated rape, 10 for the aggravated robbery, five for the aggravated burglary and four for the unlawful employment [of a firearm] during the commission of a dangerous [felony]. As to the mitigating factors, the only factor that I did find at all was the fact that he was young and that he does not have a record. But, again, those enhancement factors as far as this Court is concerned outweigh each and every one of those. . . . . That time will be served at the Tennessee Department of Correction.

Accordingly, the Defendant's sentence was twenty-four years. It is from these judgments that he now appeals.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004).

Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors applied to the defendant's sentence. T.C.A. § 40-35-401(b)(2) (2004). The 2005

amendments, however, deleted, as grounds for appeal, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

Appellate review of sentences has been de novo with a presumption of correctness. *See* T.C.A. § 40-35-401(d) (2010). In a recent decision, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. *State v. Susan Renee Bise*, 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708; *State v. Christine Caudle*, __ S.W.3d __, No. M2010-01172-SC-R11-CD, 2012 WL 5907374, at *5 (Tenn. Nov. 27, 2012) (explicitly applying the same standard to questions related to probation or any other alternative sentence).

A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*.; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

The "presumption of reasonableness" applied to sentences imposed by trial courts "'reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, *both* the sentencing judge and the Sentencing Commission will have reached the *same* conclusion as to the proper sentence in the particular case.'" *Bise*, 380 S.W.3d at 703 (quoting *Rita v. United States*, 551 U.S. 338, 341 (2007)). A presumption of reasonableness "simply recognizes the real-world circumstance that when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of [sentencing purposes] in the mine run of cases, it is probable that the sentence is reasonable." *Rita*, 551 U.S. at 350-51.

In conducting its review, this Court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in

Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102, -103, -210 (2010); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* T.C.A. § 40-35-401 (2010), Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2010).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d 699 at n.33, 704; *Carter*, 254 S.W.3d at 343. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

In the case under submission, the trial court applied enhancement factor (5), that the Defendant treated the victim with exceptional cruelty, to his convictions; enhancement factor (7), that the offense involved a victim and was committed to gratify the Defendant's desire for pleasure or excitement; and enhancement factor (10), that the Defendant had no hesitation about committing a crime when the risk to human life was high. *See* T.C.A. § 40-35-114 (5), (7), (10).

The Defendant contends that the trial court improperly applied these enhancement factors. He first asserts that the trial court did not state with any specificity which enhancement factor applied to any particular conviction. We disagree. The trial court first discussed the enhancement factors in relation to "Count 1, the aggravated rape charge." It then discussed that it was applying the three aforementioned enhancement factors to those two convictions. The trial court later stated: "As to the aggravated robbery, the same enhancement factors were found as far as the First Count as well as the burglary, the same enhancement factors which were the three I enumerated before." The trial court found applicable all three enhancement factors to each of these three convictions. The trial court did not discuss the applicability of the enhancement factors to the employing a firearm conviction, presumably because it requires a mandatory period of incarceration.

The Defendant next contends that the trial court erred when it allowed the State to argue that enhancement factor (7) applied, despite the fact that the State had not listed this factor in its notice of enhancement. The State notes that the trial court ruled in its oral findings that this enhancement factor applied. In its written order, however, the trial court crossed out this enhancement factor and did not state that it applied to the Defendant's sentence. The trial court's written findings of fact indicate that it only applied enhancement factors (5) and (10). *See* T.C.A. § 40-35-114 (5), (10). We conclude that the trial court's written findings more accurately reflect its findings with respect to the Defendant's sentence. Accordingly, we conclude that the trial court enhanced the Defendant's sentence based upon only two enhancement factors, (5) and (10), and that it did not enhance the Defendant's sentence based upon enhancement factor (7). We, therefore, turn to address whether the trial court erred when it applied those two enhancement factors and whether the Defendant's sentence wholly departed from the 2005 Sentencing Act.

The trial court applied enhancement factor (5), that the defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense, based upon the fact that her young child was in her arms during the rape. The trial court recounted how the victim attempted to pinch her child to get her to cry in hopes that the Defendant would not rape her. The trial court said, "just the fact that she was raped and her own child was in the room while that act was being done was absolutely something that most people could not even conceive or [fathom] that . . . the mother would be raped while a child even though it's a baby, was in that room." The Defendant came into the victim's room after she had been raped by Oliver, and he told her that he wanted her to perform oral sex on him. The victim, who was holding her fourteen-month-old child, refused. The Defendant pushed the victim down. The victim pinched her daughter, hoping to avoid being raped again, and the victim's child began to cry. The Defendant pulled his pants down, got on top of the victim, and raped her. The victim's daughter, who was crying, lay between the victim and the

Defendant. We conclude the trial court did not err when it found that the Defendant treated the victim with exceptional cruelty.

We similarly conclude the trial court did not err when it applied enhancement factor (10), that the Defendant had no hesitation about committing a crime when the risk to human life was high. The trial court found that there was a weapon involved during the rape and robbery. The trial court concluded that, based upon the facts that were presented during the trial testimony, not only could the victim have been hurt or killed, but also her two children, one of whom was in the room. The trial court said "there was a firearm involved and so things could [have] gotten totally out of hand and somebody could [have] ended up being killed." The evidence at trial proved that Oliver had a weapon during the robbery and rape and that the Defendant had a box cutter. Both men had their weapons in close proximity to the victim and her child while they raped her. The trial court correctly noted the heightened risk to human life under these circumstances.

As the enhancement factors applied by the trial court are supported by the evidence, we conclude the trial court properly sentenced the Defendant. He is not entitled to relief on this issue.

In our review of the Defendant's sentence, we note that the trial court made written findings of fact. Those findings indicate that the Defendant is sentenced to a total effective sentence of twenty years. It then notes that Count I, Count II, and Count II (clearly meant to be III) should run concurrently with each other but consecutively to Count IV. This would mean the Defendant's total effective sentence was twenty-four years. This comports with the oral findings made by the trial court at the conclusion of the sentencing hearing.

The judgments of conviction do not accurately reflect the Defendant's sentence. The judgment of conviction for Count 1, aggravated rape, indicates first that the conviction was for aggravated robbery. Count 2 was the aggravated robbery conviction, and the conviction in Count 1 was for aggravated rape. Further, the judgment for indicates that the sentence for that offense should run concurrently with "Counts 02 & 03 & 04." It then indicates "N/A" in the section of the judgment form stating to which convictions the sentence should run consecutively. This judgment must be amended to state that the sentence in Count 1 was the conviction for aggravated rape and to show that the sentence should run concurrently with Count 2 and Count 3, but consecutively to Count 4, consistent with the trial court's ruling.

The Defendant's judgment of conviction for Count 2, aggravated robbery, indicates that the sentence should run concurrently with "Counts 01, 03 & 04" and makes no indication of any sentence to which it should run consecutively. This judgment of conviction should

reflect that the Defendant's sentence for this offense should run concurrently with Count 1 and Count 3 but consecutively to Count 4 as stated by the trial court.

The Defendant's judgment of conviction for Count 3, aggravated burglary, correctly indicates that the sentence for that offense should run concurrently with Count 1 and Count 2 and consecutively to Count 4.

The Defendant's judgment of conviction for Count 4, employing a firearm with intent to commit a felony, indicates that the Defendant's sentence for that offense should run concurrently with Count 1 and Count 2 but consecutively with Count 3. That judgment of conviction should indicate that the Defendant's sentence for that offense does not run concurrently with any other offense and that it runs consecutively to Count 1, Count 2, and Count 3, as announced by the trial court and required by statute. That judgment is further unclear in that it does not clearly indicate whether the trial court sentenced the Defendant to four or six years for that offense. The new amended judgment should clearly and accurately reflect the Defendant's sentence.

Accordingly, we remand this case for the entry of corrected judgments of conviction that accurately reflect the Defendant's sentences for each of his four convictions.

## III. Conclusion

Based upon the foregoing authorities and reasoning, we conclude that the trial court did not err when it denied the Defendant's motion to suppress the victim's identification of the Defendant from a photographic lineup containing his picture. We further conclude that the trial court did not abuse its discretion when it sentenced the Defendant. There are, however, multiple errors in the judgments, as noted in this opinion. We, therefore, affirm the Defendant's judgments of conviction and sentence, but we remand the case to the trial court for entry of amended judgments that legibly and consistently reflect the trial court's sentence.

_____
ROBERT W. WEDEMEYER, JUDGE